**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA**

*************************************************************

| IN RE: | ) | Bktcy. 10-70574-JAD |
| --- | --- | --- |
| GREGORY S. MORRIS | ) | Chapter 11 |
| DEBTOR | ) | |

*************************************************************

| IN RE: | ) | |
| --- | --- | --- |
| | ) | Bktcy. 10-70676-JAD |
| HAMPTON INN ALTOONA PENNSYLVANIA, L.P. | ) | Chapter 11 |
| DEBTOR | ) | |

*************************************************************

| IN RE: | ) | |
| --- | --- | --- |
| | ) | Bktcy. 10-70677-JAD |
| MORRIS MANAGEMENT REAL ESTATE, L.P. | ) | Chapter 11 |
| DEBTOR | ) | |

*************************************************************

| IN RE: | ) | |
| --- | --- | --- |
| | ) | Bktcy. 10-70678-JAD |
| ALTOONA VVB, L.P. | ) | Chapter 11 |
| DEBTOR | ) | |

*************************************************************

| IN RE: | ) | |
| --- | --- | --- |
| | ) | Bktcy. 10-70679-JAD |
| 200 EAST PLANK ROAD, L.P. | ) | Chapter 11 |
| DEBTOR | ) | |

*************************************************************

| IN RE: | ) | |
| --- | --- | --- |
| | ) | Bktcy. 10-70681-JAD |
| TYRONE PCH, L.P. | ) | Chapter 11 |
| DEBTOR | ) | |

*************************************************************

```
****************************************************************
     IN RE:                         )
                                    )      Bktcy. 10-70685-JAD
     MMFRE LIMITED PARTNERSHIP      )
                                    )      Chapter 11
          DEBTOR                    )
****************************************************************
     IN RE:                         )
                                    )      Bktcy. 10-70686-JAD
     VENMOR TIPTON PARTNERSHIP      )
                                    )      Chapter 11
          DEBTOR                    )
****************************************************************
     IN RE:                         )
                                    )      Bktcy. 10-70687-JAD
     MORRIS MANAGEMENT              )
     HARRISBURG, L.P.               )      Chapter 11
                                    )
          DEBTOR                    )
****************************************************************
     IN RE:                         )
                                    )      Bktcy. 10-71136-JAD
     BEDFORD PCH, L.P.              )
                                    )      Chapter 11
          DEBTOR                    )
****************************************************************
     IN RE:                         )
                                    )      Bktcy. 10-71137-JAD
     CLEARFIELD PCH, L.P.           )
                                    )      Chapter 11
          DEBTOR                    )
****************************************************************
     IN RE:                         )
                                    )      Bktcy. 10-71138-JAD
     MMH, L.P.,                     )
                                    )      Chapter 11
          DEBTOR                    )
****************************************************************
     IN RE:                         )
                                    )      Bktcy. 10-71139-JAD
     PHASE TWO 17$^{TH}$ STREET LOGAN  )
     TOWNSHIP, L.P.                 )      Chapter 11
                                    )
          DEBTOR                    )
****************************************************************
```

```
**************************************************************
IN RE:                          )
                                )       Bktcy. 10-71140-JAD
VENMOR PARTNERSHIP              )
                                )       Chapter 11
     DEBTOR                     )
**************************************************************
IN RE:                          )
                                )       Bktcy. 10-71330-JAD
VM ASC, LLC                     )
                                )       Chapter 11
     DEBTOR                     )
**************************************************************
```

**OBJECTION OF CARROLL P. OSGOOD, M.D., AND DIANE OSGOOD TO JOINT DISCLOSURE STATEMENT FILED BY GREGORY S. MORRIS (CH. 11 CASE #10-70574, DOC. #267)**

COME NOW Carroll P. Osgood, M.D., and Diane Osgood, individuals who are husband and wife, by and through their undersigned counsel, and do file the within Objection, upon a cause whereof the following is a statement, to wit:

1. On September 12, 2011, Gregory S. Morris ("Morris"), filed a Joint Disclosure Statement in all of the above-captioned cases (the "Disclosure Statement"). For ease of reference, the Disclosure Statement is of record in Chapter 11 Case #10-70574-JAD, Doc. # 267.

2. The Disclosure Statement was filed in support of a Chapter 11 Plan of Reorganization filed by Morris in all of the above-captioned cases on September 12, 2011 ("Plan"). For ease of reference, the Plan is of record in Chapter 11 Case #10-70574-JAD, Doc. #267, Exhibit "A."

3. As more fully set forth below, the Osgoods respectfully submit that the Disclosure Statement is not approvable because: 1) the Disclosure Statement does not provide "adequate information" as required by 11 U.S.C. § 1125(a)(1); and 2) the Plan is fatally flawed and not confirmable.

4. Carroll P. Osgood, M.D., and Diane Osgood (the "Osgoods") are equity security holders, parties in interest and creditors of, *inter alia*, the following Debtors:

    a.   Gregory S. Morris

  b.  Hampton Inn Altoona Pennsylvania, L.P.

  c.  Morris Management Real Estate, L.P.

  d.  Tyrone PCH, L.P.

  e.  Bedford PCH, L.P.

  f.  Clearfield PCH, L.P.

  g.  MMFRE Limited Partnership

  h.  Altoona VVB, L.P.

  i.  MMH, L.P.

  j.  VM ASC, LLC

 5. Prior to the commencement of the above-captioned cases, Morris owned (or owned entities that owned and/or controlled) majority ownership interests in the above-identified Debtor entities. Morris also personally guaranteed millions of dollars of the debts of these entities.

 6. The Osgoods also personally guaranteed millions of dollars of debt owed by the various entities. Prior to the commencement of the above-captioned cases, the various Debtors defaulted under some or all of the loans which the Osgoods personally guaranteed, and the lenders demanded payment from the Osgoods.

 7. The Osgoods are creditors of Morris and hold essentially two types of claims against he and his estate.

 8. First, prior to the commencement of the above-captioned cases, the Debtors therein defaulted on some or all of the debts that were personally guaranteed by the Osgoods. Some or all of said creditors demanded payment from the Osgoods pursuant to the personal guarantees. As noted above, Morris also personally guaranteed these debts. The Osgoods contend that they have a right of contribution from Morris, although the precise amount of said claim is contingent and/or unliquidated at this time.

 9. Second, based on information obtained to date, the Osgoods have reason to believe that Morris may have

authorized, made, or caused to be made unauthorized, unapproved, disproportionate withdrawals and/or distributions from the Debtors in the above-captioned cases for his own personal benefit, or the benefit of other entities which he owned, operated and/or controlled. The precise amount of this claim is contingent and/or unliquidated at this time.

**FIRST OBJECTION TO APPROVAL OF DISCLOSURE STATEMENT: <u>LACK OF ADEQUATE INFORMATION</u>**

10. In order to be approved, the Disclosure Statement must provide "adequate information." 11 U.S.C. § 1125(a)(1).

11. "Adequate information" is defined as follows:

> "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims and interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the Court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information."

<u>See</u> 11 U.S.C. §1125(a)(1).

12. The disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution. <u>In re Ferretti</u>, 128 B.R. 16 (Bankr. D. N.H. 1991).

5

13. Several courts have noted that a disclosure statement should include at least 19 different types of information. In re Scioto Valley Mortgage Co., 88 B.R. 168 (Bankr. S.D. Ohio 1988); In re A.C. Williams Co., 25 B.R. 173 (Bankr. N.D. Ohio 1982); In re Feretti, 128 B.R. 16 (Bankr. D.N.H. 1991); In re U.S. Brass Corp., 194 B.R. 420 (Bankr. E.D. Tex. 1996).

14. Other courts have stated that, at a minimum, the disclosure statement must contain the following to be approved: 1) a description of the business; 2) its history; 3) financial information; 4) description of the plan; 5) facts about the execution of the plan; 6) a liquidation analysis; 7) identification of management and its compensation; 8) transactions with insiders; and 9) tax consequences of the plan. In re Malek, 35 B.R. 443 (Bankr. E.D. Mich. 1983).

15. Further, disclosure statements must contain factual support for any opinions contained therein since opinions alone do not provide the parties voting on the plan with sufficient information upon which to formulate decisions. In re Fierman, 21 B.R. 314 (Bankr. E.D. Pa. 1982); In re East Redley Corp., 16 B.R. 429 (Bankr. E.D. Pa. 1982); In re Civitella, 15 B.R. 206 (Bankr. E.D. Pa. 1981).

16. A Chapter 11 plan proponent has a duty to disclose potential adversary proceedings against creditors before they vote on the plan. Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d. Cir. 1988).

17. With the foregoing principles in mind, it is respectfully submitted that the Disclosure Statement does not provide "adequate information," and as a result, cannot be approved.

18. The Osgoods submit that the Disclosure Statement-which is offered in support of a Plan which impacts no less than fifteen (15) different estates having millions of dollars of assets and liabilities-does not provide "adequate information." Significantly, the Disclosure Statement provides that "no information concerning the Debtors is authorized other than the information set forth in this statement. Any representations or inducements made to secure your acceptance or rejection of the Plan which are other than as contained in this Joint Disclosure

6

Statement should not be relied upon by you in arriving at your decision." See Disclosure Statement, Page 4. As a result, **the sole information creditors and other parties in interest are permitted to rely upon when deciding whether to accept or reject the Plan is the information contained within the four corners of the Disclosure Statement.**

19. The Osgoods submit that the Disclosure Statement fails to meet the "adequate information" standard in the following respects:

    a. <u>Lack of Information About Morris's Investor, Jeff Long</u>

As Morris himself admits, "the primary funding for the Plan will come from a partnership between Morris and Jeff Long, a successful and well-known businessman in Altoona, Pennsylvania…Mr. Long will assume the role of general partner in the Morris/Long partnership entities. Mr. Long, and his ability to provide funding for the Plan, is known by both the Osgoods and the Ventura Estate as well as most, if not all, of the secured creditors in these various cases." See Disclosure Statement, page 7-8. According to Morris, Mr. Long "would be involved in the refinancing or assumption of more than $23,000,000.00 of debt with perhaps an additional assumption/refinance of $3,000,000.00 more…" See Disclosure Statement, page 21.

Despite Mr. Long's obviously pivotal role in the Plan, however, no financial information about Mr. Long is provided in the Disclosure Statement. No financial statements or projections are included. No details as to assets or capitalization of Mr. Long is provided. Further, while the Osgoods can speak only for themselves, contrary to the assertions of Morris, the ability of Mr. Long to provide funding for the Plan is not well known to the Osgoods. Further, at least three secured creditors (Ameriserv, Jersey Shore, and First National Bank) have advised the Osgoods that Mr. Long's ability to provide funding for the Plan is unknown to them as well.

Based on Long's pivotal role in the Plan, it is incumbent upon the plan proponent to demonstrate Mr. Long's ability to take on such obligations. The complete dearth of information provided by Morris about Mr. Long is quite surprising to the Osgoods given that Morris previously objected to the disclosure statements filed by the Ventura

7

Estate in the Hampton Inn Altoona Pennsylvania, L.P., and Morris Management Real Estate, L.P. cases, **on the basis that the plan proponents failed to provide adequate information about the source of funding to consummate the Ventura Estate's plans of reorganization in those cases (a to-be formed entity referred to as "Newco").** This Court declined to approve the Disclosure Statements filed in those cases based upon this very objection.

Further, the Disclosure Statement is completely devoid of any confirmation from Mr. Long that he has agreed to do that which Morris says he has agreed to do. Mr. Long did not file or join in the Disclosure Statement or Plan. There is no agreement or other indicia of Mr. Long's willingness to do that which Morris says he will do attached to the Disclosure Statement or Plan. Other significant representations made by Morris in the Disclosure Statement are demonstrably false (see ¶¶ 27-31, below).

If Morris is relying on Mr. Long to be his "White Knight," creditors and parties in interest are entitled to be provided with a firm commitment from Mr. Long and enough information about Mr. Long to allow them to make an informed decision.

    b.   <u>Insufficient Description, History, and Financial Information About Benmor, LP</u>

Benmor, LP ("Benmor") is apparently a limited partnership of which Morris is a 50% owner. No reference to Benmor is included in the description of Morris's assets on pages 8 and 9 of the Disclosure Statement. Benmor is not a Debtor in any bankruptcy proceeding (Chapter 11 or otherwise).

The Disclosure Statement provides the following bare bones information about Benmor: 1) it owns undisclosed real estate worth $2 million, which is encumbered by a mortgage having an outstanding balance of approximately $500,000.00. The sole information provided about the real estate is that it "has Med-Express as a tenant." This is inadequate.

No information is provided as to who owns the remaining 50% of Benmor. No information is provided as to any personal property that Benmor might own, nor is there

any statement that Benmor owns no personalty. No information concerning the basis of the $2 million valuation for the real estate-or even where the real estate is located-is provided. No information concerning the arrangement with Med-Express is provided. This information is not an adequate description of Benmor's business, its history, and its financial information.

Notwithstanding this lack of information, however, Benmor's interests (and Morris's interest in Benmor) figure prominently in the Plan. The entities involved in these Chapter 11 cases are owned by some combination of essentially three groups: Morris, the Osgoods, and the Ventura Estate. In Morris's words, the Plan requires "property swaps…which will result in Morris or Morris related entities owning interests in some entities and the Ventura Estate owning interests in others." Benmor is one of the entities involved in the "property swaps." The Osgoods will be completely divested of all of their ownership interests in the various entities under the Plan in exchange for one interest-free payment of $100,000.00 per year for ten years.

In other words, the existing ownership arrangement will be destroyed, with the three groups essentially dividing up the businesses or, in the case of the Osgoods, receiving a cash buyout. Therefore, it is imperative that these three groups be able to compare the value of what they currently have to the value of what they will be left with under the Plan in order to decide whether to vote for or against it. Given the lack of information provided about Benmor, the Osgoods (and other parties in interest) have no way of making such a comparison.

    c. <u>Insufficient Disclosure of Facts About the Execution of the Plan</u>

Even ignoring the fatal flaws in the accompanying Plan set forth in detail below, and assuming that all of the impossible assumptions upon which the Plan is based are somehow possible, the Plan provides insufficient disclosure of facts concerning the execution of the Plan.

Under the Plan, Morris-personally-is required to obtain financing (and releases of existing guarantee options) to satisfy debts owed to various lenders which aggregate approximately $3.4 million. The Disclosure

9

Statement is void of information about any efforts made by Morris to secure such financing. While Morris claims to have interested parties who may partner with him to assist in obtaining the requisite financing (other than Mr. Long, who will not be involved in the refinancing of these debts), the identity of such other interested parties is not disclosed, let alone any information about the financial wherewithal of the mystery parties. If other "White Knights" are to come to Morris's rescue, creditors and other parties in interest are entitled to know who these "White Knights" are and to be provided with enough information about them to allow creditors and parties in interest to make an informed decision.

There is also minimal information provided regarding Morris's own ability to obtain financing. The Disclosure Statement indicates that Morris will receive property interests under his plan which "should enable him to obtain the $3,400,000.00 in financing needed to extinguish such debt." This bald assertion is wholly unsupported by any facts whatsoever. Further, the Disclosure Statement mentions that among the debts owed by Morris are various non-dischargeable obligations owed to casinos which total $231,296.30. Such nondischargeable debts would presumably impact Morris's creditworthiness, yet there is absolutely no discussion of the potential impact of these debts on Morris's ability to obtain credit.

Finally, the Disclosure Statement all but concedes that Morris will not be able to obtain the requisite financing by stating that Morris will liquidate the assets of Morris Management Harrisburg, Morris Management Frankstown Real Estate and VM ASC and use the proceeds from such sales to satisfy the debt. No information is provided as to how long such liquidations will take, costs of sale, whether Morris has begun to market these assets, whether any potential buyers have expressed interest in purchasing the properties, or even whether Morris has engaged the services of a realtor or broker. Further, as explained in greater detail in the next section, no information concerning the basis of the valuation of the assets to be liquidated is provided.

        d.    <u>Insufficient Liquidation Analysis</u>

Section VII of the Disclosure Statement contains a two-page liquidation analysis which provides in pertinent

part that, "in the aggregate, the real estate is believed to have equity," "several of the Debtors operate as going concerns quite well while others are non-operational and hold real estate but generate no income," and "the value of the various Debtors' personalty is relatively nominal." See Disclosure Statement, page 27-28. Based on the foregoing, Morris opines that "it is believed that a flat out Chapter 7 liquidation would result in nominal or no distributions to the majority of creditors in these estates." See Disclosure Statement, page 28. Under the circumstances of these Chapter 11 cases (15 in total), the foregoing liquidation analysis is grossly inadequate.

First, Morris provides absolutely no disclosure about the basis of the valuations for the various pieces of real estate owned by the various estates, and for some entities, there are unexplained discrepancies between the schedules Morris previously filed and his Disclosure Statement concerning 1) the extent of the Debtor's real estate holdings and 2) their valuations.

Morris Management Real Estate, L.P. ("Morris Management"), is a prime example of these unexplained discrepancies. In the Disclosure Statement, Morris discloses that Morris Management owns real estate on Charlotte Drive in Altoona, some portions of which are leased to third parties. See Disclosure Statement, Page 10. Morris states that the Charlotte Drive real estate has "an approximate fair market value" of $15 million, but that the real estate is subject to a secured claim of S&T Bank "in the approximate amount" of $10 million.

The basis of the $15 million dollar valuation is especially significant given that the same property was valued at only $10 million in the Debtor's Schedule A, which was filed by Morris subject to the penalties of perjury. If the property is worth only $10 million, then there is no equity in the real estate because the same is subject to a $10 million mortgage.

There is no explanation provided as to whether the basis of the new $15 million figure is Morris's opinion, an appraisal, or some other source. Further, to the extent these conflicting valuations both represent Morris's opinion, no explanation is provided as to why the value of the real estate increased by 50% in less than eighteen months.

11

An additional concern is that no information is provided about the Morris Management leases with third parties. As such, creditors and parties in interest are left to guess as to when the leases might end, whether the lease terms are favorable, and whether the loss of a tenant might impact the value of the real estate.

Further, the Disclosure Statement does not even mention three additional parcels of real estate which are included in Morris Management's Schedule A, which have an aggregate scheduled value of $250,000.00.

Disclosure of all of Morris Management's assets, their valuations, and the basis of such valuations are critical pieces of information which are missing from the Disclosure Statement. Unfortunately, this lack of disclosure is not limited to the Morris Management real estate; rather, **no basis for any valuation of any real estate is provided anywhere in the Disclosure Statement**.

Disclosure of the Debtor's assets, their values, and the basis for those values is the bedrock of any liquidation analysis, and the complete lack of disclosure of 1) assets and 2) the basis of their valuations renders the Disclosure Statement void of "adequate information."

      e.   <u>Insufficient Information Regarding Treatment of Unsecured Creditors</u>

The Disclosure Statement disclosure statement fails to clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution. <u>In re Ferretti</u>, 128 B.R. 16 (Bankr. D. N.H. 1991). While the Disclosure Statement references three classes of unsecured creditors (designated as Classes 13, 14 and 15), and states the total amount of claims of such classes, unsecured creditors are not given any information as to how much they can expect to receive on their claims, when they will receive distributions, and what contingencies exist. Further, the Disclosure Statement vaguely asserts that some of the Class 15 claims are disputed, but the identity of the disputed claims is not revealed.

In fairness to Morris, the Plan itself (but not the Disclosure Statement) does indicate what Classes 13, 14 and

15 can expect to receive.  However, the source of the payments to be made to such creditors is not disclosed. With respect to Class 15, the Plan provides that a fund is being created via monthly payments which is projected to result in creditors receiving an approximate 1/3 distribution.   However, there is no disclosure of the source of the funds to be used to make such distributions.

More specifically, it is unclear whether the distributions will be funded by one of the estates over which Morris and/or Long will assume control, by some of such entities, or by all of such entities.  Further, it is unclear whether the Ventura Estate will be responsible for some portion of said payments.  Finally, it is unclear whether whichever entity(s) is/are responsible for funding the Plan are agreeing to become jointly and severally liable for such obligations to the creditors, such that a debt for which only one of such entities was originally responsible is now the liability of all of the entities. This is critical information, particularly given that Class 15 is being asked to wait five (5) years for payment and is not receiving any interest. In the event of a default during the repayment term, neither the Disclosure Statement nor the Plan are clear as to the creditors' rights.

> f. Miscellaneous Lack of Information

In addition to the foregoing, the Osgoods respectfully submit that the Disclosure Statement is also lacking in sufficient information concerning the following:  1) identification of management and its compensation; 2) insufficient factual support for the proponent's opinions; and 3) insufficient information regarding any avoidance actions or other adversary proceedings.

**SECOND OBJECTION TO APPROVAL OF DISCLOSURE STATEMENT: THE UNDERLYING PLAN IS NOT FEASIBLE AND NOT CONFIRMABLE**

20. A Disclosure Statement should not be approved if the underlying plan of reorganization is fatally flawed and not confirmable.  In re Market Square Inn, Inc., 163 B.R. 64 (Bankr. W.D. Pa. 1994); In re Filex, Inc., 116 B.R. 37 (Bankr. S.D.N.Y. 1990); In re Comandante Management Co., LLC, 359 B.R. 410 (Bankr. D.P.R. 2006).

21. Despite the fact that some of the above Chapter 11 cases (including Morris's personal Chapter 11 case) have

13

been pending for as long eighteen months, he has failed to propose a feasible and confirmable plan of reorganization.

22. While it is admitted that Morris filed the Plan, the same is clearly not feasible and not confirmable.

23. As Morris himself admits on pages 6 and 7 of his Disclosure Statement, his Plan is entirely predicated on at least three fundamental assumptions: 1) some creditors, including the Osgoods, agree to release their claims against the various Debtors; 2) among other owners, the Osgoods agree to transfer their interests in various Debtor entities to a "to be formed" entity controlled by Morris and an investor at prices dictated by Morris with no competitive bidding process whatsoever; and 3) that the various creditors who hold personal guarantees, including guarantees of the Osgoods, agree to release those guarantees and allow the "to be formed" entity to assume the existing debt. This tripartite foundation-without which the Plan cannot come to fruition-is fundamentally flawed.

24. First, there is no legal basis (under bankruptcy law or non-bankruptcy law) pursuant to which Morris could force the Osgoods (or anyone else) to release their claims against him. The only possible way in which this fundamental component of Morris's plan could materialize is if the Osgoods (and others) were to consent to such treatment. The Osgoods do not consent.

25. Second, there is no legal basis (under bankruptcy law or non-bankruptcy law) pursuant to which Morris could force the Osgoods (or anyone else) to transfer their substantial ownership interests in the various Debtors to Morris (or Morris's to-be-created entity) at a price dictated by Morris at a time dictated by Morris with absolutely zero opportunity for any competitive bidding process. Again, the only possible way in which this fundamental component of Morris's plan could materialize is if the Osgoods (and others) were to consent to such treatment. The Osgoods do not consent.

26. Third, there is no legal basis (under bankruptcy law or non-bankruptcy law) pursuant to which Morris could force creditors who hold personal guarantees of non-debtors (such as the Osgoods) to release such non-debtors from personally guaranteed obligations and to agree to allow

Morris or his to-be-formed entity to allow Morris or his to-be-formed entity to assume existing debt. In fact, the purported release of non-debtor guarantors would appear to be in direct violation of 11 U.S.C. § 524(e). Once again, the only possible way in which this fundamental component of Morris's plan could materialize is if the creditors who would be impacted by such a maneuver were to consent to such treatment.

27. According to Morris, these creditors are agreeable to such treatment. Indeed, Morris assures creditors and parties in interest that "Mr. Long has already approached most, if not all, of the secured creditors herein and ascertained their willingness to allow him to assume or refinance many of the secured claims in these cases which will be critical to obtaining various guaranty releases which will be necessary to effectuate the Plan. **The responses have been favorable**." See Disclosure Statement, page 8 (emphasis added).

28. One such secured creditor (Ameriserv Financial Bank) has already filed a pleading in this case (Case No. 10-70574-JAD, Doc. # 276) in which it stated, contrary to the representations in the Disclosure Statement, that it has neither been approached by Morris or Morris' purported investor, Jeff Long, regarding an assumption or refinance of the existing debt, nor is Ameriserv familiar with Mr. Long's purported financial wherewithal. Additionally, Ameriserv stated that it would not agree to allow any assumption of its debt, nor was it likely to agree to release the obligations of personal guarantors.

29. Troubled by the irreconcilable conflict between Morris's representations in the Disclosure Statement and Ameriserv's response, and in a display of their good faith and willingness to consider Morris's proposal, the Osgoods and their counsel travelled to Williamsport, Pennsylvania, to confer with representatives of Jersey Shore State Bank (one of the lenders whose debts were personally guaranteed by, among others, the Osgoods), in order to determine whether Morris or Mr. Long had approached Jersey Shore about an assumption of the existing debt. Jersey Shore advised the Osgoods that, similar to Ameriserv, neither Morris nor Mr. Long had done so. Further, Jersey Shore, similar to Ameriserv, advised the Osgoods that it was not familiar with Mr. Long's purported financial wherewithal. Finally, similar to Ameriserv, Jersey Shore stated that it

15

would not agree to release the Osgoods' obligations arising under their personal guarantees.

30. Within the past 24 hours, representatives of First National Bank have advised the Osgoods that Mr. Long had not approached it about an assumption or refinance of the existing debt, it was not familiar with Mr. Long's purported financial wherewithal, and it would not agree to release the Osgoods' personal guarantees.

31. As such, Morris's representations that Mr. Long has approached the secured creditors and that the creditors are agreeable to Mr. Long's assumption or refinancing of the existing debt not are patently false with respect to at least three critical secured creditors. In point of fact, at least three critical secured creditors **have never even been approached by Mr. Long**.

32. The Plan has additional flaws which render it not feasible and not confirmable. For example, Morris's monthly operating reports indicate that, during the entire pendency of this case, he has had $327.00 cash on hand. Yet, the plan calls for Morris to pay-in full-all administrative claims on or before the Effective Date, which is defined as "ninety (90) days after the Confirmation Date." <u>See</u> Plan, Page 12. Through July 31, 2011, counsel's fees and expenses had already exceeded a quarter million dollars and were fast approaching $300,000.00. This represents just one of the four administrative claims disclosed in the Plan. Additionally, Morris proposes that he-personally-will pay the Ventura Estate $150,000.00 in exchange for a release of any ownership interest it may have in the VM ASC, LP entity. How Morris, who according to his own monthly operating reports has $327.00 to his name, will be in position to pay hundreds of thousands of dollars to such parties in the next several months is unexplained and, likely, unexplainable.

33. With all due respect to Morris, his Plan is simply not feasible and not confirmable. As such, the Disclosure Statement cannot be approved.

WHEREFORE, the Osgoods respectfully request that the Court deny approval of the Disclosure Statement, and further, they do authorize their counsel to file this pleading on their behalf.

                          Respectfully submitted,

                          SPENCE, CUSTER, SAYLOR,
                          WOLFE & ROSE, L.L.C.

By:  */s/ Roger P. Poorman*
     James R. Walsh, Esquire
     Pa. ID. # 27901
     Roger P. Poorman, Esquire
     Pa. ID. # 206562
     400 Ameriserv Financial Building
     P.O. Box 280
     Johnstown, PA 15907
     JWalsh@spencecuster.com
     RPoorman@spencecuster.com
     Counsel for Carroll P. Osgood, M.D., and Diane Osgood